IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

MICHAEL A. DEAN, et al.,          )
                                  )
                Plaintiffs,       )
                                  )
vs.                               )
                                  )  Case No.: 6:07-CV-03298-GAF
MICHAEL BOWERSOX, et al.,         )  JURY TRIAL DEMANDED
                                  )
                Defendants.       )

MEMORANDUM IN SUPPORT OF
SUPERSEDING AMENDED COMPLAINT UNDER THE CIVIL RIGHTS ACT OF
42 U.S.C. SECTION 1983

COMES NOW, Plaintiffs, Dean, Gibson, and Edmonds, acting pro se, and hereby respectfully submit the following Memorandum in Support of their Superseding Amended Complaint under the Civil Rights Act of 42 U.S.C. Section 1983, as follows:

Purpose and Objective of this Memorandum

1. The purpose and objective of this memorandum is to provide specific details of the actions of the Defendants which includes dates, names of censored publications, and other detailed information regarding the allegations of First Amendment violations committed by the Defendants. Additionally, this Memorandum is intended to provide some specific theories and authorities, under which the Plaintiffs, with their extremely limited legal knowledge, believe the allegations are supported. In addition, this Memorandum is intended to prevent the contentions that Plaintiffs are making only "naked assertions," as to the actions of the Defendants, and the Constitutional implications thereof, as well as to point to specific Exhibits of Evidence.

2. This Memorandum is in no way intended to be construed as the

1

"Statement of Claim" for the purposes of Fed R. Civ. P. 8(a), which has specifically been provided in complience as a "short and plain statement," in the limited space provided on the Court Approved Complaint Form page 3, and in one additional paragraph on an added page numbered as page 3(a). Instead, this Memorandum provides a "road-map," and points to specific items of evidence in support of the Statement of Claim provided on the Court approved form.

3. In light of the above, Plaintiffs respectfully contend that their pro se allegations should in fact be liberally construed, (See Atkinson v. Bohn, 91 F.3d 1127, 1129 (8th Cir. 1996) (per curiam). Further, that there should be consideration made of the fact that the Defendants are in possession of all of the censored materials, and the Plaintiffs have not been afforded the ability to review much of the material in question, nor is it likely that the Plaintiffs will be given the opportunity to due so, in that the aggregated censored publications are legion. That is of course, outside of the Court appointing counsel for the Plaintiffs, so counsel could through the Discovery process, review the offending pages and alleged contraband.

## Forma Pauperis Status Under the Prisoner Litigation Reform Act.

4. That on the 21st day of September, 2007, this Court granted Plaintiffs Leave to Proceed in this matter in Forma Pauperis. Plaintiffs have paid in full the entire filing fee of $350.00, via payments as set forth in the Prisoner Litigation Reform Act.

## Background

5. On the 7th day of September, 2007, Plaintiffs, while all being held in custody at South Central Correctional Center, in Licking, Texas County, Missouri, filed their complaint under the Civil Rights Act Section

2

1983, citing that the Defendants have violated their rights under the First Amendment to the Constitution of the United States by unreasonably applying Department censorship policies. Plaintiffs further asserted that Defendants have violated their rights by setting into place, certain contraband policies that when unreasonably applied, resulted in additional violations of Plaintiffs' rights under the First Amendment.

6. That this Court granted a Motion to Dismiss filed by the Defendants on the 6th day of December, 2007. Subsequently, Plaintiffs filed a timely Motion to Alter or Amend Judgment Pursuant to R. Civ. P. 59(e), which was ultimately denied by the Court on the 1st day of February, 2008. Plaintiffs thereafter, appealed to the 8th Circuit Court of Appeals.

7. The United States Court of Appeals for the 8th Circuit issued an "unpublished" per curiam disposition, submitted on April 7, 2009 and filed on the 22nd day of April, 2009. The Court of Appeals affirmed the District Court's dismissal only to the extent of any facial challenge to Department regulations denying sexually explicit material or material promoting violence, citing that Plaintiffs did not put forth any alternative to these regulations.

8. However, after a de novo review of the District Court's Dismissal for failure to state a claim, The Court of Appeals found that Plaintiffs had indeed sufficiently stated a claim with regard to the way the regulations denying sexually explicit material and material promoting violence were being applied to the particular publications at issue, citing Murphy v. Mo. Dep't. of Corr., 373 F.3d at 986 (8th Cir. 2004). Further, the Appeals Court remanded on the Plaintiffs' facial challenge of any policy prohibiting publications because they contain stickers, posters, or other free items, and also on the "as-applied" challenge to those polices. The

3

Court of Appeals made such finding after liberal construction of Plaintiffs'
pro se allegations, and taking into consideration that Plaintiffs have not
been allowed to view the materials in question. The Appeal Court's Mandate
issued on the 15th day of May, 2009, and Missouri Assistant Attorney General
Cheryl Ann Schuetze entered her appearance on behalf of the Defendants'
on the 3rd day of September, 2009.

9. On the 22nd day of September, 2009, Plaintiffs filed their Motion
for Leave to File a Supplemental Complaint, along with their proposed
Supplemental Complaint and additional Exhibits marked as E. through K.
Defendants' subsequently filed a Motion for More Definitive Statement in
which they asserted that Plaintiffs had not complied with Fed R. Civ. P.
8(a), which requires a "short and plain statement of claim." This Court
granted Defendants' motion and directed Plaintiffs "...to file a superseding
amended complaint, which includes all claims and parties from the original
complaint which survived appellate review, as well as all claims and parties
from the supplemental complaint."

10. Using the "Court Approved Form" as directed, Plaintiffs have
attempted to comply with this Court's Order regarding the filing of
Superseding Amended Complaint, and with Rule 8, in the limited space provided
for on that form with the exception of "one paragraph," submitted as page
3(a) by the Plaintiffs. The instant Memorandum is submitted in Support of
the Complaint and related Statement of Claim contained therein.

**Qualified Immunity**

11. In the case of the Defendants', all of which are government
officers, they are protected from liabilities unless the law is clearly
established and the party asserting immunity objectively could not have
believed that his conduct was lawful. However, the Plaintiffs' First

4

Amendment rights are clearly established even in light of their
incarceration, nor are Plaintiffs' First Amendment rights inconsistent with
incarceration. Pell v. Procunier, 417 U.S. 817 LE2d 495, 94 S.Ct. 2800
(1974).

12. Each of the Defendants named herein, imposed or endorsed the
imposition of the violations of the Plaintiffs' rights under the First
Amendment. Plaintiffs clearly outlined, provided case law, and documentation
setting forth the standards set by law for sexually explicit, obscene and
inflammatory material, as well as the law governing the unreasonable
application of any policy which results in the violation of Plaintiffs First
Amendment Rights, and repeated the same at every stage of the Administrative
remedy process. As a result, there is no possible way that the Defendants
were not aware that the Courts have ruled that the type of censorships they
were and still are imposing upon the Plaintiffs are in fact contrary to
the law. Further, the Defendants were clearly made aware by and through
**countless Administrative Remedy Requests and personal contact with the
Plaintiffs, that not allowing the Plaintiffs an opportunity to review the
censored items to enable Plaintiffs to perfect an appeal of the said**
censorship, is contrary to the prevailing case law, and a violation of the
Due Process Clause. (See Broulette v. Starns, 161 F. Supp. 2d. 1021)

13. The Defendants were also well aware by and through the contents
of the Administrative Remedy Process, and should have already been aware
by the nature of their positions, that any such censorship must be related
to "legitimate" penological interests, and that the burden to prove the
same is upon them.

14. Further, by the nature of their positions and by and through the
content of the Plaintiffs' Administrative Remedy Requests, Defendants were

5

or should have been aware of the illegal nature of using items contained within the pages of the publications, such as folded up pages which unfold into a poster, or tear out pages with stickers on them, as means to censor the content and information within a publication. The Defendants had a legal obligation to be aware of the constitutional rights of the Plaintiffs. Especially the Plaintiffs' rights under the First Amendment to the United States Constitution. Their actions were and are illegal and violate the Plaintiffs' rights guaranteed under the Constitution of the United States.

15. Under the circumstances that apply to the Plaintiffs and the Defendants, no reasonable official could believe that his or her conduct was lawful in light of clearly established law. Hunter v. Bryant, 502 U.S. 244, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991); Anderson v. Creighton, 483 U.S. 635. 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); Act Upl Portland v. Bagley, 988 F.2d 868 (9th Cir, 1998). None of the Defendants in the instant matter are entitled to qualified immunity for the reasons stated above, in that the law was clearly established, and they were in fact aware of the law.

## Remedy Being Sought by Plaintiffs

16. Plaintiffs are seeking injunctive relief in the form of an order directing the Defendants to apply the Statutory Definitions and Guidelines Under Section 573.010 RSMo, a Missouri Statute that by its nature complies with Federal Law, when defining material as "sexually explicit," and/or "obscene material," when considering censorship of any material. Those statutory definitions make "exempt" from such definition, any work of art or of anthropological significance. Further, the statutory "three prong test" for obscene material, makes exempt, any publication that when taken as a whole, contains some serious literary, artistic, political and/or

6

scientific value based on articles of editorial comment contained within a publication. Thus such an order should result in the application of the legal statutory definitions and prohibit censorship based on the censoring party's own personal moral and/or religious based opinion and/or values.

17. Further, Plaintiffs seek injunctive relief in the form of an order that Defendant's apply a consistent "clear and present danger standard" similar or comparable to the one outlined in <u>Sostre v. Otis</u>, 330 F. Supp. 941, that will result in a consistency and a specific "guideline that is not ambiguous" in regards to the application of policies which prohibit material that promotes violence, is "inflammatory, or racial" in nature.

18. Additionally, Plaintiffs seek injunctive relief in the form of an order which will direct the modification of any policy which will allow the censorship of a publication because it contains free gifts, posters, stickers and/or any other "common advertising gimmick," and additionally order that applying such policies that are unrelated to the information protected under the First Amendment to the Constitution, in the publication, be prohibited.

19. Plaintiffs also seek injunctive relief that will require Defendants to set into place a policy that will allow an incarcerated offender an opportunity to review any material for which Defendant's allege a publication should be censored, to reasonably facilitate Plaintiffs' ability to perfect an appeal of said censorship.

20. Plaintiffs seek $20,000.00 in total punitive damages which is to be donated on Plaintiffs' behalf to the AGAPE House Woman's Shelter in Houston, MO.. Plaintiffs seek to additionally be personally awarded the "cover price" of each publication that has been wrongfully censored, and to personally recover reasonable cost of litigation to include costs of

7

filing fees, estimated copies and postage.

21. Any or other relief as the Court may deem just and proper in this case.

## Legal Theory and Authority in Support Thereof.

22. Plaintiffs in this "Civil Rights" action, are incarcerated prisoners held under convictions in the Missouri Department of Corrections. The offenses alleged herein occurred while Plaintiffs were all being housed at South entral Correctional enter, in Licking, Missouri. After the filing of the original complaint in this matter, the Plaintiffs were separated by the transferring of Plaintiff Gibson, and Plaintiff Dean, to other Missouri correctional facilities. Plaintiff Edmonds remains in custody at South Central Correctional Center. Although the Plaintiffs have various levels of education, none of the Plaintiffs have any training in the legal or related fields and are therefore greatly disadvantaged as far as the drafting of legal briefs, Responses, Replies, and Motions and other documents which may be required during the course of litigation. Therefore, Plaintiffs contend that Court should liberally construe Plaintiff's pro se allegations. See Atkinson v. Bohn, 91 F.3d 1127, 1129 (8th Cir. 1996) (per curiam).

23. The Defendants named as parties to the complaint related hereto have intentionally deprived the Plaintiffs of their constitutional rights under the First Amendment of the Constitution of the United States by improperly censoring and seizing various publications. Publications which were lawfully sent through the United States Mail, and comply with the regulations and prohibitions as regulated by the Laws governing United States Mail.

24. The specific incidents of censorship in question occurred while Plaintiffs are or were being held in custody at South Central Correctional

8

Center, in Licking, Texas County, Missouri, within the Western District of Missouri.

25. The Defendants have imposed such censorships in such a way as to negate any legitimate concerns or government interests. See Murphy v. MO Dep't. of Corr., 373 F.3d at 986

26. The Defendants have failed to properly apply the Constitutional standards for obscenity, sexually explicit material, and for material considered to be inflammatory, by imposing, (although inconsistently), their own individual personal moral and/or religious viewpoints. Or, by simply unreasonably applying any regulation to justify depriving Plaintiffs of any publication they are able to deprive Plaintiffs of, in blatant disregard for the constitutional rights guaranteed to the Plaintiffs under the First Amendment.

27. Defendants have utilized standard, common and customary advertising campaigns such as the inclusion with a publication, of various advertising stickers, posters, compact disks, or other gimmicks, which can easily be removed from the publication and disposed of, as an "open license" to prevent the publication from being given to the Plaintiffs. In modern times, such advertisements are used in nearly every publication. Therefore, utilizing the same as a means to censor the content of a publication virtually allows the Defendants the ability to completely deprive Plaintiffs of any and all publications.

28. The Plaintiffs have suffered the loss of the monetary value of the publications, but most importantly, the loss of their right to receive information and ideas. Specifically, the loss of the literary, artistic, political and/or scientific value of the publications that have been censored, based on the articles of editorial comment contained within the

9

publications.

29. The Defendants have been made aware of the constitutional standards set, in the content of the Plaintiffs' Administrative Remedy Requests. Further, the Defendants had a duty and a responsibility to know the legal implications of their actions prior to being informed of the same by the Plaintiffs. Yet they have relentlessly continued to violate the Plaintiffs' First Amendment rights. Plaintiffs contend as well that as a result of their diligent attempts to address this matter through the Administrative Remedy Process and through the instant judicial litigation, the Defendants have **censored in mere retaliation, recklessly, with irregularity, and not** utilizing any apparent legal or reasonable formula, with callous disregard and evil intent and motive.

30. To clarify the Plaintiffs' contentions, they make no challenge to the Defendant's regulations which allow them to deny sexually explicit material which violates state and Federal Law, nor to the extent that any such material is defined by the Defendants's written policies. Nor do Plaintiffs challenge the regulation which prohibits material that promotes violence and is inflammatory, or racist in nature.

31. Plaintiffs instead challenge the application of those policies to the specific publications named herein (infra). Id. Murphy, 373 F.3d at 986.

32. Plaintiffs also challenge the validity of any regulation which facilitates the ability for Defendants to censor the content of a publication on the grounds that it contains unrequested stickers, posters or other free items, which could easily be removed from the publications with the expenditure of far less man hours and effort, than the paperwork, and archiving of censored items utilized to execute censorship.

10

33. Plaintiffs contend as well that Defendants do not uniformly apply said regulations against said free gifts and contraband to publications, which leads to improper "content-based" censorship determinations."

34. In many cases, Plaintiffs have not been allowed to review the censored material, to even make a reasonable determination if the material's censoring was or was not justified. However, Plaintiffs have written to Offenders in some of the State's other prisons to see if other Offenders were receiving the same issues being censored at S.C.C.C.. In many cases the publications were being censored only at S.C.C.C. and not the other Missouri Prisons.

## Jurisdiction

35. The actions of the Defendants alleged herein occurred and are still occurring at South Central Correctional Center, located specifically at 255 W. Hwy. 32, in Licking, Texas County, Missouri, within the Southern Division of the Western District of Missouri. The case is brought pursuant to 42 U.S.C. 1983, for alleged deprivation of rights secured by the Constitution of the United States. Therefore, pursuant to 28 U.S.C. Section 1331, jurisdiction is just and proper within the United States District Court for the Southern Division of the Western District of Missouri.

## Specific Action of the Defendants

36. Defendant Bowersox is the Superintendent of South Central Correctional Center. The Plaintiffs were all housed at that facility when the offenses occurred. Defendant Bowersox was made aware of the legal standards set regarding the First Amendment Rights of the Plaintiffs' and of the censorships being challenged herein, directly and through his Designees via the Offender Administrative Remedy process executed by all three of the Plaintiffs. Further, Defendant Bowersox had an obligation by his position as Superintendent to know the legal and Constitutional standards

11

for censorship and how the same was being applied within the facility he governs. Defendant Bowersox by his position as the Superintendent, had the power and the authority to correct the violations of the Plaintiffs' First Amendment Rights, and refused to do so, while acting under the color of State law, recklessly, with callous disregard and evil motive.

37. The Missouri Department of Corrections, is the State of Missouri's Administrative Agency, into which, the custody of the Plaintiffs has been Ordered. Said Agency has, while acting under the color of State law set into place policies which are being subjected hereby, to a facial challenge as to their constitutionality, in that said policies provide for the censorship of the ideas and information contained within said publications, because the publications contain stickers, posters, and/or other free gifts. Further said Agency has failed to set into place any policy that facilitates reasonable constitutional safeguards protecting both the Plaintiffs' First Amendment Rights and Rights to Due Process, in that the Plaintiffs are not allowed to review material that has been censored and seized from the Plaintiffs to allow any proper appeal of said censorship. See Thornburgh v. Abbott, 490 U.S. 401; 109 S.Ct. 1874: 104 L.Ed. 2d 459.

38. Defendant Cornell is the Assistant Director, of the Missouri Department of Corrections. Ms. Cornell directly responded to the Plaintiffs' final appeals of the Administrative Remedy procedure and denied the Plaintiffs' any remedy, and did so acting under the color of State law, recklessly, with callous disregard and evil motive. Ms. Cornell by her position had an obligation to know and understand the legal standards regarding censorship, in relation to the Plaintiffs, and was additionally made aware of the same by and through the content of Plaintiffs' Administrative Remedy Requests. Ms. Cornell by her position had the power

12

and the authority to correct the violations of the Plaintiffs' rights and refused to do so.

39. Defendant Buckner, Associate Superintendent of South Central Correctional Center. Ms. Buckner was the Administrative Reviewer of the Plaintiffs' Offender Resolutions Requests. Ms. Buckner by her position had an obligation to know and understand the legal standards for censorship. Further she was made aware by the content of the Plaintiffs' Administrative Remedy Requests of the legal standards set regarding Plaintiffs' constitutional rights under the First Amendment. Ms. Buckner by her position as the Associate Superintendent had the power and authority to correct the violations of the Plaintiffs' rights, yet, while acting under the color of State law, she refused to do so, recklessly, with callous disregard and evil motive.

40. Defendant Don Roper, Functional Unit Manager of Housing Unit 3., at South Central Correctional Center. Mr. Roper was the Respondent to the Plaintiffs' requests for Administrative Remedy, and denied the same. Mr. Roper had an obligation by his position to know and understand the legal standards set regarding censorship in relation to the Plaintiffs, and was additionally made aware of said standards by and through the content of the Plaintiffs' Administrative Remedy Requests. By his position as the appointed Respondent to the Administrative Remedy Requests, Defendant Roper had the power and the authority to correct the violations of the Plaintiffs' rights, and yet, while acting under the color of State law, refused to do so.

41. Defendant Ricky Fisher was the Case worker for all three Plaintiffs and the Investigator assigned to investigate the Plaintiffs' requests for Administrative Remedy. Mr. Fisher was aware of the legal standards set

13

regarding censorship in relation to the Plaintiffs and their rights under the First Amendment to the Constitution. Mr. Fisher had a duty to know as the investigator, the implications of the violations of the Constitution being imposed upon the Plaintiffs. Further, by his position as the **investigator in these matters, he had the power and the authority to correct the violations of the Plaintiffs' First Amendment rights, yet, while acting under the color of State law, he refused to do so.**

42. Defendant Fahnstock, was one of the initial censoring parties. Her signature appears on Censorship Notices directed to the Plaintiffs. Ms. Fahnstock had an obligation as a person in charge of censorship to know and understand the legal standards set for censorship of publications in relation to the Plaintiffs' rights guaranteed under the First Amendment.

43. Ms. Fanstock was made aware of the legal standards and definitions for obscene material set forth in Missouri Law, specifically Sec 573.010 RSMo., as well as clearly established Federal law, such as the determination made by the United States Supreme Court in Miller v. California, 413 U.S. 15, 83 S.Ct. 2607, 37 L.Ed. 2d 419 (1973), all of which support a three prong test which renders exempt from such definition, any work of art or anthropological significance. Additionally, she was made aware by and through the Plaintiffs' Administrative Remedy Requests, that said "three prong test" for obscene material renders exempt, any publication that when taken as a whole, contains some serious literary, artistic, political and/or scientific value based on articles of editorial comment contained within a publication.

44. Ms. Faunstock has knowledge and is obligated to have knowledge by her position, of the First Amendment rights of prisoners and had the power and authority to prevent and/or correct the violations of the

14

Plaintiffs' First Amendment rights. Instead however, acting under the color of State law, she imposed her own personal views and moral guidelines as **a means to violate the Constitutional rights of the Plaintiffs, and did so recklessly, with callous disregard and evil intent.**

45. Defendant Kemna is a Deputy Division Director of Adult Institutions for the State of Missouri. Mr. Kemna directly responded to Plaintiffs' final appeals for Administrative Remedy and denied the Plaintiffs any remedy, recklessly, with callous disregard and evil motive. Mr. Kemna by his position, had the power and authority to correct the violations of the Plaintiffs' First Amendment Rights and their rights to Due Process. Mr. Kemna was made aware of the legal standard for censorship and for Due Process by and through the content of the Plaintiffs' Administrative Remedy Requests. He further had an obligation by his position to understand and to be aware of the legal standards regarding the Constitutional rights of the Plaintiffs. Mr. Kemna, acting under the color of State law, refused to correct the wrongs **being imposed upon the Plaintiffs, recklessly, with callous disregard and evil motive, knowing that the violations of the Plaintiffs' First Amendment Rights and rights to Due Process, were contrary to clearly established law.**

46. Defendant Terrena Ballinger is an Assistant to the Warden of South Central Correctional Center. Ms. Ballinger was directly involved in the responses to the Plaintiffs' requests for Administrative Remedy and failed to grant Plaintiffs any such remedy. Further, Ms. Ballinger was made aware of the legal standards set for censorship and for due process rights regarding censorship, in the Plaintiffs' Administrative Remedy Requests and had an obligation by her position to know and understand such legal standards, yet, while acting under the color of State law, Ms. Ballinger refused to remedy the violations imposed upon the Plaintiffs, recklessly,

15

with callous disregard and evil motive.

47. It is doubtful that Ms. Ballinger ever personally reviewed or even saw the censored material yet she endorsed and supported the censorship.

48. Defendant Greg Hadley is the Business Manager at South Central Correctional Center, and has acted as the Censorship Committee Chairperson. Mr. Hadley is directly responsible for the censorship and seizure of the publications from the Plaintiffs. Mr. Hadley by his position, had the power and authority to review the material and prevent and/or correct the violations of the Plaintiffs' First Amendment Rights and Rights to Due Process. Ms. Hadley by his position as the censoring party, had an obligation to know and understand the First Amendment rights of the Plaintiffs, and Due Process Rights of the Plaintiffs, and the legal implications as they apply to the Plaintiffs. He was aware that the violations were contrary to clearly established law, and while acting under the color of State law, he refused to correct and/or prevent the wrongs being imposed upon the Plaintiffs, recklessly, with callous disregard and evil motive.

49. Defendant John Rogers, is a Recreation Officer III., at South Central Correctional Center. Mr. Rogers has acted as a responding "Censorship Committee Member," and was directly responsible for the review, censorship, and seizure of publications which were lawfully subscribed to by the Plaintiffs and were compliant with state and federal law Governing U.S. Mail. Mr. Rogers, by his position as the party responsible for executing censorship had an obligation to be aware of and to understand the legal standards for censorship and the First Amendment and Due Process Rights of the Plaintiffs. He was aware that the violations against the Plaintiffs were contrary to clearly established law, yet, while acting under the color of State law, he supported and endorsed, and in fact executed the censorship

Case 6:07-cv-03298-GAF   Document 89   Filed 06/18/10   Page 16 of 50

and seizure of the publications in question, recklessly, with callous disregard and evil motive.

50. Defendant Troy Wade, is a Functional Unit Manager at South Central Correctional Center. Mr Wade was responsible for approving Responses to Plaintiffs' "Informal Remedy Requests" for relief from the unconstitutional censorship and due process violations. Mr. Wade, by his position, had the power and authority to correct the violations of the Plaintiffs', First Amendment Rights and Rights to Due process. He was made aware of the legal standards in the content of the Plaintiffs' Resolution Requests, and had an obligation by his position to know and understand the law regarding censorship of the Plaintiffs' publications. However, Mr. Wade, while acting under the color of State law, refused to correct the wrongs being done to the Plaintiffs.

51. Defendant Waylon Wilson is a Case Worker at South Central Correctional Center. Mr. Wilson conducted intial Informal Remedy Request interviews in regard to Plaintiffs' Administrative Remedy Request proceedings. Although Mr. Wilson was in fact made aware of the legal standards established and that the censorships were in fact contary to clearly established law, it appears that he is a subordinate of the Division Directors, the Warden, and Assistant Wardens to the extent that his "hands may have been tied," to respond only as directed by his superiors, to the Plaintiffs' Informal Resolution Requests. Although Mr. Wilson had a "personal moral, ethical, and most importantly, legal obligation," to uphold the Constitution of the United States, and therefore, should have responded in support of defending the Constitutional Rights of the Plaintiffs, Defendant Wilson, appears to somehow be less culpable than the above named Defendants.

17

52. Defendant Kenneth Leeder is a Case Worker at South Central Correctional Center. Mr. Leeder conducted initial Informal Remedy Request interviews at Plaintiffs' Administrative Remedy proceedings. Although Mr. Leeder was in fact made aware of the legal standards established in regards to Plaintiffs' rights under the First Amendment and to Due Process, and that the censorships were in fact contrary to clearly established law, it appears that he is a subordinate of the Division Director, Warden, and Assistant Warden to the extent that his "hands may have been tied," to respond only as directed by his superiors, to Plaintiffs' Informal Resolution Requests in regards to censorship and Due Process violations. Mr. Leeder did however have a "personal moral, ethical and most importantly, a legal obligation," to uphold the Constitution of the United States and therefore, should have responded in support of upholding the Constitutional Rights of the Plaintiffs. None the less, Mr. Leeder appears to somehow be less culpable than the other named Defendants.

## Regarding Individual Plaintiffs

53. **In regard to Plaintiff Dean,** the wrongful censorships and sezures started on the 27th day of February, 2007, with the sezure of "Rockstar" magazine Vol. #4, issue #4, from Rockstar Publishing. Defendants cited that it "Portrays explicit sex acts: sadistic sex acts; or sex in violation of state or federal law." The publication was sent via U.S. Mail and violated no laws which would prohibit the publication from being legally sent through the mail, either State nor Federal.

54. The Censorship continued with numerous other publications. Plaintiff Dean has filed and completed Administrative Remedy Requests on all of the publications set forth herein. Additional Publications censored include: Rockstar magazine May, 07', Vol. #4 issue 5; Penthouse Forum, May 07', Vol.

18

#37 No.5; D-Cup magazine, April, 07 No.117; American Curves, June, 07',
No.34 (Defendants cited that this "fitness magazine" promotes inflammatory
material on pg.76 & 145); Penthouse Forum, June, 07', Vol. #37, No.6; DCup
magazine, June, 07', No.119; D-Cup magazine, June, 07', No.:119 (this is
a second copy which was sent by the publisher); Penthouse magazine, May
07', Vol. #38 No.9; Spice T.V. Store magazine, May/June issue; Penthouse
Forum, July, 07' Vol. #37, No.7..

55. Additionally, Administrative Remedy Requests have been filed and
exhausted on numerous other publications which were properly subscribed
to per policy of the Defendants and sent to Plaintiff Dean via U.S. Mail.
(See Plaintiffs' Exhibit E. pp. 1-342). At a glance at the Index for Exhibit
E., it appears that each of the Publications sent to Plaintiff Dean which
were subjected to censorship, are "sexual in nature," and therefore, one
could reasonably conclude that the publications were censored for containing
sexually explicit material. This is not the case. Many of Plaintiff Dean's
publications have been censored for allegedly "promoting violance," or
because they "contained stickers," "portraying illegal drugs or substances,"
and in one case, allegedly compromising "Institutional Safety or Security."
(See Exhibit E. pp.251-342).

56. Although Plaintiff Dean reiterates that he makes no challenge to
the policy itself that provides for censorship of "sexually explicit"
material, he does contend, that said policies were unreasonably applied
**to his publications in a manner which is contrary to any penological
interest.**

57. Plaintiff Dean points specifically to applicable Department Policy,
**IS13-1.1 Offender Mail Procedures, Sec.III. Procedures, Subsection H.
Censored Publication/Correspondence/Photos, Subdivision 1. (Attachment C.
"Guidelines for Censoring Items.**, (which shall be hereafter, and throughout

this Memorandum, [is] referred to as "Attachment C."). A copy of "Attachment C." is incorporated herein by reference as Plaintiffs' Exhibit I.. In the first paragraph of Attachment C. said Department Policy establishes clearly that a publication "...can not be censored because it is sexual." Further Attachment C. prohibits the censorship of a publication because its content is "unpopular or repugnant," or because it is "religious, philosophical, or social." (See Exhibit I.) Exhibit I. also establishes that each publication or item must be reviewed on a "case-by-case basis." This language prevents the total ban on any specific publication. See <u>Murphy v. Mo. Dept. of Corr.,</u> 372 F2d. at 986.

58. Plaintiff Dean contends that this determination demands that not only the initial censoring party, review each publication, but also that any party investigating, and/or responding to each and every stage of the Administrative Remedy Process be required to review a censored publication, and in Plaintiff Dean's case, as well as the cases of the additional Plaintiffs', after the initial censorship, none of the Responding Administrative parties, employed at S.C.C.C., have seen nor reviewed individually, the censored publications. This fact virtually renders void the Administrative Remedy process, and indicates that after initial censorship, none of the Defendants that are employed at S.C.C.C., have any idea of what specific content in a publication, has resulted in it being censored, and therefore, no reasonable ability to make any proper determinations as to if the Constitutional Rights of the Defendants are in fact being violated or not. This completely circumvents Due Process protections.

59. Exhibit I., Attachment C. Sec.12, subdivisions a.- h., provides a specific list of sexual items for which censorship is proper. In the case

of Plaintiff Dean, Defendants have never afforded him an opportunity to review any of the censored items to determine if perfecting a proper appeal of the censorship is justified. Therefore, his only option to protect his First Amendment Rights, is to first request Administrative Remedy, and now to have the Court conduct an independent review of the evidence to determine if there has been an exaggerated response to prison concerns in relation to each particular item. Id Murphy at 986. In nearly every case, Plaintiff Dean has nothing more than the Defendants' offering of conclusory statements and post hoc rationalizations for their conduct. See Murphy at 989.

60. Plaintiff Dean Contends that there are indeed items for additional consideration when looking at censorship for sexual content. First the Court could compare the specific publications in question to publications the Defendants have not censored and allowed the Plaintiff to receive. Plaintiffs have submitted examples of publications which have not been censored in Plaintiffs' Exhibit H., and are in possession of numerous additional examples. Secondly, censored publications should be compared to publications not censored at other Level 5 Security, Missouri Prisons. (See Exhibits H-17 to H-24), in keeping with plaintiffs' rights under the Fourteenth Amendment.

61. Defendants should be required to demonstrate how the censoring of the "censored publications" met more of a penological interest than the "uncensored publications" of similar content. Plaintiff contends that the Defendants can not demonstrate that the censorship of many of the publications, if any at all, which were censored for sexual content, meet more of a "legitimate" penological interest or, that the material in question violates the provisions of "Attachment C," more than the sexual content contained in the uncensored publications in Exhibit H. and/or referenced

in the third party reviews by offenders in other Level 5 Security Missouri Prisons in Exhibits H-17 to H-24.

62. Plaintiff Dean contends that it appears that the Defendants have in fact imposed a "total ban," on D-Cup Magazine, Penthouse Forum Magazine, and Celebrity Skin Magazine, in that Plaintiff Dean has never received even one copy of these publications. Further, Plaintiff Dean has at no time been given any opportunity to review the specific issues of these publications that have been censored, in order to determine if he should appeal the censorships. Therefore, in order to ensure his First Amendment Rights are indeed protected, he has been forced to blindly challenge the censorship of every censored issue. See Murphy at 986.

63. Plaintiff Dean has also had publications censored, which the Plaintiffs allege "Promote" Violence, Portraying Illegal Drugs or Substance, or for that matter, allegedly for simply, "Institional Safety or Security." Once again Plaintiff contends that these items should be reviewed for determination as to if the censorship was in fact an "exaggerated response to prison concerns."

64. In making such a determination, each individual censored item should be compared to items the Defendants did not censor. If one uses the "instructions on how to properly impose a "Waterboard Torture," as in Exhibit H-13, which was not deemed by the Defendants as needing to be censored, as a "litmus test" for promoting violence, or the article on "Where to Find Lost Cocaine, How to Dry it Out, and How to Resell it," found in Exhibit H-9, which was not deemed by the Defendants as needing to be censored, as a "litmus test" for portraying illegal drugs, or, for that matter, the article on "How to Escape From Prison, How to Make the Tools to Get the Job Done, and Where to Get the Materials in Prison to Make Them," as found

22

in Exhibit H-3, which was not deemed by the Defendants as needing to be censored, as the "litmus test" for Institutional Safety and Security, it becomes very doubtful, that any of the publications censored, meet more of a "legitimate" penological interest, in regard to the respective grounds for censorship, than the foregoing, which the Defendants did not deem as needing to be censored.

65. Therefore, Plaintiff Dean contends that the censorships of his publications were indeed comparatively, an "exaggerated response to prison concerns." Id. Murphy at 986.

66. Plaintiff Dean has also had publications censored because they contained "free gifts, posters, or stickers." The Plaintiff contends that he has provided a reasonable alternative of simply removung any such items if they are indeed actually prohibited by policy, and then to release the publication to him. Said alternative would be far less burdensome demanding far less man hours, and is far more workable than executing the extensive procedure required for censoring a publication. Additionally, Plaintiff contends that Defendants can not demonstrate how a poster included in a publication circumvents any penological interest more than a page of the Kansas City Star News Paper or other similar news paper of the same size, which unfolds to basically what amounts to a "poster size" item, and which to the best of the Plaintiffs' knowledge, has never been censored. Plaintiff contends that the Defendants can not demonstrate any legitimate reasonably rounded fear that such alternative will lead to greater harm. See Thornburgh v. Abbott, 490 U.S. at 419.

67. Plaintiff Dean also contends that the Defendants have circumvented his rights to Due Process, by asserting a "reason for censorship," and then, when Plaintiff challenged the censorships, Defendants answered Administrative Remedy Requests asserting entirely different justifications for censorship,

23

unrelated to the allegations on the Censorship Notices provided to Plaintiff. This action renders the Administrative Remedy Process virtually useless, in that if Plaintiff makes a legitimate challenge to censorship, Defendants simply answer the Remedy requests in regard to censorship with a previously undisclosed rationalization for censorship. (See Exhibits E. pp.243-250, 258-263, 278-285, 286-293, 323-328, & 337-342).

68. **In regard to Plaintiff Gibson**, the wrongful censorship and seizures started on the 5th day of April, 2007 with the seizure of "Backpacker" magazine for May, 07, Vol. 35, issue 249, No.4, from MaryAnn Bokkodahl, EVP, Group Publisher. Plaintiff Gibson received the Censorship Notification form from the Defendants regarding this publication on 04/06/07, citing that it was censored because the publication "Contains Stickers." Plaintiff Gibson was given a "Covenant Not to Sue" form by the Defendants on 04/09/07, in regard to this censorship but he refused to enter into such a covenant and instead, exhausted his Administrative Remedies regarding censorship.

69. Since the initial censorship, Plaintiff Gibson has been subjected to the censorship of an additional nine publications, for which he has exhausted Administrative Remedy Requests. (See Exhibit G. pp.608-669.).

70. Many of the censorships that Plaintiff Gibson has been subjected to are for a publication titled "All The Way Magazine." A copy of the Publication which was not censored has been incorporated herein as Exhibit H-29. It remains unclear if this is or is not the same publication cited as being titled "The Way" in the matter of Murphy v. Mo. Dept. of Corr., 372 F.3d at 986. If it is not the same publication referenced in Murphy Id., it is similar in nature and content.

71. Plaintiff Gibson has been subjected to the censorship of the September 08', October 08', November 08', December 08', January 08', April

24

09', and May 09' issues of All The Way Magazine. Defendants cited that the issues "contain information which can be used to instill violence or hatred among offender population." Although Defendants have allowed one or two copies of the publication into the facility, it would appear that this act is nothing more than the Defendants allowing a "token copy" in, here and there so that they can claim compliance with the Eight Circuit's determination in Murphy that "A prison's total ban on publications that espouses white supremacy is overly broad and does not closely conform to the purpose of upholding the security of the prison." (citing Murphy at 986).

72. Before prison authorities censor materials they must review the content of each particular item received Williams v. Brimeyer, 116 F.3d 351, 354 (8th Cir. 1997). Plaintiff Gibson contends that many of the Defendants have never even seen the foregoing issues of "All the Way Magazine," and for that matter, most of the Defendants have not seen nor reviewed "any" of the publications which have been censored. Yet, they have acted as "endorsers of the censorships," acted as "members of the Censorship Committee," specifically denied Plaintiffs' Informal Remedy Requests," and "denied Grievances," without ever reviewing the censored material individually, themselves.

73. The actions of the Defendants described in paragraph 72., renders any due process protections useless. The entire concept of having individuals who are on a "censorship committee," and more importantly, having an "Administrative Remedy" process that consists of three complete stages, is to have "redundancy" that facilitates accountability and requires the verification of the validity of an action. Ultimately, the process is to set into place the constitutional safeguards of Due Process, and to protect

25

the rights of imprisoned Missouri Offenders. However, in the case of the Defendants, when the material comes in the mail and the item is censored, the prison officials signs off on the censorship documents without ever reviewing the censored items. Then, when the Offender initiates the Administrative Remedy process, the Defendants simply agree with the censorship, condone and support the censorships, and deny the requests for remedy without ever once seeing or reviewing the censored items. When one combines these facts with the fact that the Plaintiff was never allowed to review the censored material to enable him to perfect a proper contest to the censorships, Plaintiff Gibson contends his rights to Due Process are virtually "non-existent" in regards to censorship.

74. Plaintiff Gibson makes no challenge to the Defendants' policy which prohibits information that may be used to instill violence and hatered. Plaintiff contends instead that an individual review of specific issues of "All the Way" magazine that were censored, do not satisfy the factors established in <u>Turner v. Safley</u>, 482 U.S. at 89-90, in that the publications do not in any way, counsel violence, and certainly not in a manner any greater than the issue which was not censored. (See Exhibit H-29). Therefore, said policy was unreasonably applied to the censored publications. Plaintiff Gibson contends that Defendants' censorships are an exaggerated response to penological concerns. Further, many of the Defendants who have participated in the censorship, and/or failed to rectify the unconstitutional censorship during the Administrative Remedy Process, have never even seen or reviewed the content of the publications.

75. In regard to Plaintiff Gibson's publications which were censored as a result of having "Posters" and/or "Free Gifts," plaintiff contends there are two factors for consideration. First the Posters for which his

Case 6:07-cv-03298-GAF   Document 89   Filed 06/18/10   Page 26 of 50

publications have been censored were not "free gifts," but instead, a part of the publications and included in the subscription price.

76. Secondly, if the Plaintiffs contend that the "posters themselves" impose some type of security risk that would circumvent some penological interest, Plaintiff points then to Exhibits K-1. & K-2. These Exhibits are pages out of a regular news paper, which is never censored for being a poster size document. Plaintiff asserts that the posters for which his publications have been censored, pose no more of a threat, to any penological interest than the pages of most any city's news paper, which unfolds the same way to a "poster size document," and are never censored for being poster size.

77. Further, the posters included in a publication, like a news paper page, can be unfolded when being viewed by an Offender, and simply folded back up, just like a news paper, when an Offender is done looking at it. Certainly this is a reasonable alternative to censorship. Further, this alternative of allowing an offender to simply fold the poster up and keep it in the publication it was included with, like Plaintiffs do with any news paper, is far less burdensome and far more workable than executing the extensive procedure required to censor material from the Plaintiff.

78. Plaintiff Gibson contends that Defendants can demonstrate no legitimate penological interest greater than the one a poster size news paper page would precipitate, which are not censored, in their need to censor an entire publication, because it contains a poster. Further there is always the alternative as previously provided by the Plaintiff, of simply removing the posters from publications, disposing of them and forwarding the publication to the Plaintiff.

27

79. **In regard to Plaintiff Edmonds**, the wrongful censorship and seizures started on the 21st day of February, 2007, with the censorship of Sports Illustrated Magazie, February 16, 2007 issue, Vol. 106 No.7. The Defendants cited that the magazine "Contains unauthorized glasses/pg.175." In this case the fact that the Censorship Notification clearly reflects the page number as being "p.175" demonstrates that the so called glasses were in reality nothing more than a page in the magazine that as part of an advertisement, included paper 3-D glasses. This is a common advertising gimmick used by many publishers of magazines. Examples of the same type of paper 3-D glasses that have been allowed into the facility without censorship and a sworn statement by a facility librarian staff person named Brandi Curl, stating that this type of advertisement is common and traditionally allowed into the facility, are incorporated as Exhibits "A" and "B".

80. Plaintiff Edmonds contends that the foregoing demonstrates and makes a threshold substantiation, that the Defendants have manipulated policies to justify the imposition of their own personal moral standards. The paper 3-D glasses in Exhibits A. & B., are from a T.V. Guide Magazine and a Sailing Revolution magazine. However, they did not result in the censorship of those publications. In Plaintiff Edmonds' case, the paper 3-D glasses were an advertisement in the February 16, 2007, Vol. 106 No.7 Sports Illustrated. This issue is better known as "The Swimsuit Issue." The overly obvious comparison to the publications that were not censored as a result of having 3-D glasses included, and the censorship wrongfully imposed upon Plaintiff Edmonds, is the fact that the censored magazine had models in swimsuits in it.

81. Censorship for the advertisement was used as a means to impose

28

the Defendants' own moral and/or religious values in opposition of the publication. This opens the door to such imposition any time, in any way with complete disregard for the Plaintiffs' rights to receive the literary, artistic, political and or scientific value of the publication, based on articles of editorial comment contained within the publication.

82. Once Plaintiff Edmonds addressed this matter via the available remedies within the institution, his mail and publications became targeted. Additional censorships that were contrary to the norm followed immediately. National Geographic Magazine May, 07' Vol. 221, Issue 05, was censored for containing a page that unfolded into a poster. The page could be easily removed (if seriously necessary). In this instance, a common well established educational magazine, with literary, artistic, political and scientific value was seized because it had a page that unfolded, (much like a news paper which are never censored for being posters). The publication is an award winning magazine used in schools and libraries world wide. Its quite clear that the Defendants had no concern whatsoever, for the First Amendment rights of the Plaintiff and no legitimate penological interest in censoring the publication.

83. Plaintiff Edmonds was also subjected to the censorship of Penthouse Magazine, May, 07' Vol.38 No.9. Defendants cited that the publication "promotes violence, disorder or the violation of state or federal law including inflammatory material on pp.14 & 15." Plaintiff Edmonds exhausted Administrative Remedies regarding the censorship.

84. Since those two censorships, Plaintiff Edmonds has been subjected to the censorship of more than thirty-seven additional publications. Twenty-four of those publications for which Administrative Remedies have been exhausted, are referenced in Exhibit F. pp. 343-599. There are five

Case 6:07-cv-03298-GAF   Document 89   Filed 06/18/10   Page 29 of 50

additional publications referenced in Exhibits L, M, N, O, P, for which Administrative Remedies have been exhausted, and one publications referenced as Exhibit Q, which is still in the stages the of Administrative remedy process. Further, there are an additional seven publications, all of which are referenced in Exhibit R. The publications in Exhibit R. are publications that have relatively recently been censored, and for which Plaintiff Edmonds has not field Administrative Remedy Requests. The issue of censorship and Due Process have been well exhausted, and the Defendants for years now have responded in the exact same manner to the Plaintiff's claims of First Amendment violations and to Due Process violations. At this point the paperwork and grounds for Remedy, and responses from the Defendants are simply a "redundancy." However, the Plaintiff submits Exhibits R., "solely for the purpose of demonstrating that the violations are ongoing."

85. In regard to the publications for which Administrative Remedies have been exhausted, Plaintiff has in most every case, specifically addressed at all stages of his Administrative Remedy Requests, the fact that he has not been given any opportunity to review the censored items to enable him to perfect a proper appeal of the censorship, and that as a result, his Due Process Rights are being violated. Defendants have consistently acknowledged in their responses to Administrative Remedy Requests, that the Plaintiff is challenging the fact that he is not being afforded any opportunity to review the censored material, to allow Plaintiff to perfect a proper appeal of the censorships. However, a review of the numerous Administrative Responses, will reveal that Defendants have refused to even respond to the Plaintiffs' requests to review the material, or to the violations of Plaintiffs' Due Process Rights. (See Generally Exhibit F.) See Thornburgh v. Abbot, 490 U.S. 401; 109 S.Ct. 1874: 104 L.Ed. 2d 459.

86. In addition, Plaintiff Edmonds has filed and exhausted Administrative Remedies "specifically" on the issue of Due Process and not being afforded an opportunity to review the censored items to perfect a proper appeal of the censorships which he is being subjected to. (See Exhibit F. pp.600-607).

87. That out of all of the Administrative Remedy Requests made by Plaintiff Edmonds, Defendants have only admitted that the March, 2009 Issue of Playboy Magazine "does not meet the criteria to be censored." Defendant Kempker, Directed that the Magazine be returned to Plaintiff Edmonds. (See Exhibit F. p.442). This determination was made in the final stage of the Administrative Remedy Process. The determination substantiates that Defendants Terrena Ballinger, John Rogers, Kenneth Leeder, Michelle Buckner, Troy Wade, and Michael Bowersox, were directly responsible for the wrongful and unconstitutional censorship of the March 2009, Playboy Magazine.

88. On the 7th day of August, 2009, the March 09' issue of Playboy Magazine, was returned to Plaintiff Edmonds. Attached to the front of the publication was a Memorandum to the S.C.C.C. Censorship Committee, from the Department's Legal Counsel stating that he disagreed with the censorship of the publication and was returning it to the Plaintiff. The Censorship Notice that was originally issued in regard to the March 09' Playboy, stated that it was being censored as a result of it "promoting" violence specifically on page 15 of the publication. (See Exhibit F. p.432). After receiving the publication which was returned at the direction of the Defendants' Legal Counsel, Plaintiff discovered that the alleged promotion of violence for which the March, 09' Playboy was censored, was a "Review of a Video Game." The review was obviously intended to inform perspective buyers of the game's content and in no way counseled violence of any kind.

89. Certainly, it is clear that the censorship referenced in paragraph 88, was indeed an "exaggerated response to penological interests," and the censorship was unconstitutional. That being said, Plaintiff Edmonds contends that an independent judicial review of many of the individual publications censored, will reveal that the censorships for the alleged promotion of violence, were in fact for "video game reviews or advertisements, movie reviews or advertisements, nearly identical in nature to page 15 of the March 09' Playboy." (See Exhibit J. on p.15). Plaintiff contends that any censorship of any of the publications referenced herein as a result of content similar to page 15 of the March 09' Playboy, is in fact a violation of the plaintiffs' rights under the First Amendment and to Due Process under the 14th Amendment.

90. Plaintff Edmonds additionally had publications censored for "containing free items," in most cases Defendants asserted that the so called "free item" is a "poster" such as the one contained in many National Geographic Magazines. (See related Exhibits F.)

91. Specifically addressing National Geographic Magazines, the often included posters are in fact "a part of the publication" referenced in the Publication's Index and directly corresponding to a specific "Educational Article" within the publication. The posters are included in the "cover price" of the publication and are in no way a "free gift." Therefore, the censorship is an exaggerated response to the policy that prohibits "free gifts," in that it was not free but paid for in the subscription price of the publication, and in most cases listed in the Index and/or on the cover of the publications as being a part of the magazine.

32

92. If in fact the Defendants contend that there is some penologigal interest such as "safety and security" in allowing an offender to have a "poster size" document in the instution, Plaintiff directs the Court's attention to a copy of most any city's News Paper. (See Exhibit K.), and request that a page be "unfolded" like any poster included in a magazine would have to be unfolded. The news papers are never censored for being construed as a poster. Further, the news papers in most cases, open up to an even larger document than the ones for which the highly respected educational publication, "National Geographic Magazines, are being censored for containing.

93. The fact that the Defendants would be attempting to go "out of their way," to censor such a highly respected educational publication such as National Geographic Magazine, certainly brings to surfice that the Defendants' motivation towards the Administrative Agency's "Mission Statement, which asserts a goal of "rehabilitation and successful reentry, of Offenders," is in truth, profligated.

94. In the 2003 Report of the Re-Entry Policy Council, a public/private partnership funded in part by the U.S. Department of Justice, the U.S. Department of Labor, and the U.S. Department of Health and Human Services, it was determined that "recidivism rates are inversely related to education obtained by offenders during the period of incarceration." It would seem that if Defendants were truly concerned with rehabilitation and the prevention of recidivism, they would be supporting an Offender subscribing to such a well established educational publication such as National Geographic Magazine, instead of reaching as far out into left field as they can, to justify its censorship.

95. Plaintiff contends that the foregoing actions by the Defendants

33

clearly demonstrates that the "motive behind the censorship is in no way that of any "legitimate" penological interest," but instead, "plainly motivated by a callous disregard for the Plaintiffs' constitutional rights, and carried out with evil intent, applied in the most reckless manner.

96. Plaintiff Edmonds has also been subjected to the censorship of his Easy Rider Magazines. Said censorship was unconstitutional in that the posters for which they were censored, circumvent no "legitimate" penological interest greater than the page of any city's news paper (See Exhibit K.). which are never censored for "being" or "containing posters." Plaintiff contends that such a "poster" contained within any of the publications which have been censored by the Defendants are in fact "not free gifts," as asserted by the Defendants. (See Exhibit F. pp.491, 502, 510, 529, 538, 557, 558). The posters are obtained only by the Plaintiff subscribing to the publications and are included in the subscription price. The censorships which have been imposed by the Defendants in this case asserts only that they are "free gifts," which they are clearly not.

97. Defendants in their censorships of the publications for containing posters have at no time asserted that the posters themselves compromise any "legitimate" penological interest. Plaintiff contends that the posters contained in the censored publications are "no more of a free gift" than the "Parade Magazine," or the inserted coupons and flyers for "Country Mart," or other stores, which come with most any city's news paper, and often unfold to "poster size documents," which have never been viewed as justification for the censoring of a news paper. (See Exhibit K.) Nor do posters, the posters themselves, compromise any "legitimate" penological interest, any more than the pages of news papers which unfold into "poster size" items. (See Exhibit K.).

Case 6:07-cv-03298-GAF   Document 89   Filed 06/18/10   Page 34 of 50

98. It should be noted as well that the Defendants often place large posters up on the walls in housing units, and hallways, using nothing more to secure them than "Scotch Tape," which of course could be easily removed by an Offender if he wanted a poster for some "unknown" illicit use. Yet, Defendants obviously find no penological interest is compromised in putting posters up when it is convenient for them to do so.

99. Ultimately, if in fact the Court were to make a determination that there was some type of "legitimate" (emphasis added), penological interest in not allowing poster size items into the institution, and of course in the cases of items which are not an actual part of a publication and which are in fact free and unsolicited, such as CD's or other gifts used as promotional gimmicks, Plaintiffs have indeed offered an alternative of simply removing such a free item and then releasing the publication to the Plaintiffs. Plaintiffs contend that the provided alternative would be far less burdensome and far more workable than the process of executing the extensive procedure required for censorship. Plaintiff contends that Defendants can demonstrate no legitimate reasonable rounded fear that the alternative will lead to greater harm. See Thornburgh v. Abbot, 490 U.S. at 419.

100. Plaintiff Edmonds has also had publications censored for "sexual content." Plaintiff makes no challenge to the policy itself that prohibits material because it is obscene and/or sexually explicit, in violation of State and/or Federal Laws. However, Plaintiff contends that Defendants can not demonstrate how the censored items meet more of a penological interest than the items Defendants did not deem as requiring censorship in Exhibit H.. Therefore, censorship was unconstitutional in that it is an "exaggerated response" to prison concerns. Further, each particular item must be reviewed

35

and Defendants should demonstrate that the censorship was appropriate. See Murphy v. Mo. Dept. of Corr., 372 F.2d at 986.

101. Plaintiff Edmonds has also been subjected to publications being censored for Portraying Illegal Drugs or Substances. Plaintiff contends that the applications of said policy meet no "legitimate" penological interest. There should be a direct comparison of the Plaintiff's censored publications to publications which were not deemed as requiring censorship, to establish if the censorships were in fact an "exaggerated response to prison concerns." When one considers articles and publications which were not censored, such as the one found in the October 07' Penthouse Magazine (Exhibit H-9 pp. 112-117), called "Cocaine Harbor," containing photos of Cocaine, instructions on how to find cocaine washed up on beaches, how to dry it out, and then how to resell it, it becomes quite a challenge to determine that anything in any of the publications which have been censored, meets more of a "legitimate penological interest." Yet the October 07' Penthouse Magazine was not deemed as needing to be censored. On the other hand, Defendants asserted that there was a "legitimate" penological interest in censoring the April 09' Penthouse Magazine for an article on pages 80-85 of the issue. (See Exhibit F. pp.480-490). The article for which the publication was censored was on the "U.S. Military in conjunction with Columbian Officials having "success" in stopping the illegal drugs." (See Exhibit H-25). "If anything," that article could be considered information on the opposition of drug use.

102. Plaintiff Edmonds has most receiently completed the Administrative Remedy process on the publications referenced in Exhibits L., M., N., O., & P.. Each of the foregoing Exhibits will indicate that the publications were censored for containing "posters." Plaintiff Edmonds

36

contends that Defendants' policy, if it does provide specifically for the "censorship," of the content of a publication because it contains or was sent with some other item and/or so called "free gift," meets no legitimate penological interest to the extent that said policy facilitates content based censorships. Further, Plaintiff Edmonds contends that the application of such contraband policies, to the publications in Exhibits L. through P. are unreasonable and result in the unconstitional censorship of the content of the Publications. Further, Plaintiffs' Rights under the 14th Amendment to Due Process have been violated in regard to these publications in that he has been denied any ability to see the censored item, to perfect a proper appeal of the censorship.

103. In addition to the foregoing, Plaintiff Edmonds has initiated the Administrative Remedy process on one additional publication. Specifically the May 10, 2010, National Geographic magazine. The magazine was censored for allegedly Promoting violence, disorder in violation of state or federal law including inflammatory material (throught) pages 54-73. Plaintiff contends that after reviewing pages 54-73, of the publication which is in the facility library, he has found that the information on those pages is in reality an article on how "Mexican Citizens have turned to prayer, instead violence to deal with the nation's present hardships." The article states that the Catholic Church has increased the amount of "Masses" per day to eleven, to accommodate all the citizens who wish to ask "St. Jude," for intercession. As a result of Plaintiff's findings, Plaintiff wishes to preserve the right to bring this publication in a Supplemental Complaint, if the matter is not resolved in the Administrative Remedy process, after it has been exhausted.

104. Once again, Plaintiff Edmonds reiterates that the publications

37

referenced in Exhibit R. are presented only to demonstrate that the Defendants Censorships are "ongoing."

## Legal Foundations Supporting Complaint

105. The fact that Prisoners retain their First Amendment rights is well established. Pell v. Procunier, 417 U.S. 817, 41 L.Ed. 2d 495 S.Ct. 2800 (1974). The rights of a prisoner to receive uncensored publications, information and ideas based on the articles and editorial comment contained within the publications has continued to be sustained and upheld by the Courts. Valiant-Bey v. Morris, 829 F.2d 1441; Broulette v. Starns, 161 F. Supp 2d 1021; Sostre v. Otis, 330 F. Supp. 941.

106. The policies for censorship within the institution in which the Plaintiffs are housed are governed by IS13-1.1 Offender Mail Procedured, Section III. Procedures, Subsection H. Censored Publications/ Correspondence/Photos, Subdivision 1. (Attachment C.) (See Exhibit I.) Attachment C. of said policy is titled "Guidelines for Censoring Items." The First paragraph of Attachment C. clearly establishes that the guidelines are based on the First Amendment in that "A publication or item may not be rejected because its content is religious, philosophical, social, sexual (emphasis added), or is unpopular or repugnant."

107. Item 2. in the Guidelines specifically refers directly to explicit sex acts, sadistic sex acts, or sex acts in violation of state or federal law. State and federal laws and definitions along with specific guidelines for censorship are well established and outlined. In Missouri, pornography and related offenses are governed under Revised Missouri Statutes Chapter 573. Plaintiffs refer here specifically to Section 573.010 Definitions. Sec. 573.010 (4) RSMo., defines "Explicit sexual material." In the Definition established in Missouri Law, works of art or of anthropological significance

38

shall not be deemed to be within that definition. In addition, Subsection
(12) clearly defines "obscene material." Here there is established a "three
prong test." The third prong of this test requires that the each publication
must be reviewed in its entirety, and "when taken as a whole," the
publication must lack any serious literary, artistic, political, or
scientific value based on articles and editorial comment, to be defined
obscene. Plaintiffs contend that Defendants failed to and/or unreasonably
applied their policies in a manner contrary to the statutory standard to
the extent that it has negated any "legitimate" penological interest.

108. The same constitutional standard in relation to prisoner's mail,
has indeed been established by the United States Supreme Court in Miller
v. California, 413 U.S. 14, 93 S.Ct. 2607, 37 L.Ed. 2d 419 (1973), and
supported by the "Hook Consent Decree," date October 19, 1973, and in
Broulette v. Starns, 161 F. Supp. 2d 1021 (2001). The Censorship Notices
for each of the publications censored by the Defendants have been presented
as evidence, starting with Exhibit C. and continued throughout Plaintiffs
Exhibits. Each notice states the name, date, and volume number of the
publications seized for censorship, as well as the page numbers of the
content allegedly causing the censorship.

109. The Defendants have violated the Plaintiffs' rights to Due Process
under the 14th Amendment in that they have refused to provide the Plaintiffs
access to the alleged censored items to provide them the opportunity to
perfect any reasonable appeal of the censorships. Plaintiffs have indeed
requested such access and exhausted the Administrative Remedy process on
this issue repeatedly. See Thornburgh v. Abbott, 490 U.S. 401; 109 S.Ct
1874: 104 L.Ed. 2d 459. After being denied such access, Plaintiffs have
had third parties outside of the facility in many cases review the specific

Case 6:07-cv-03298-GAF   Document 89   Filed 06/18/10   Page 39 of 50

publications censored on the page numbers and volumes indicated in the Censorship Notices. None of the reviewed publications meet the three prong test established as a constitutional standard for censorship. Further, reviewing of pictures alone in a publication does not suffice as grounds for censoring the "content" of a publication, and results in First Amendment violations. Broulette v. Strans, 161 F. Supp. 1021.

110. The United States Court of Appeals for the Eight Circuit has held that when a Department of Corrections mail policy goes unconstitutionally overboard, censorship of the mail must be justified on the basis of institutional security and safety. Further, "the prison officials carry the burden of establishing the need for the censorship and must defend the decision to withhold the delivery of "any particular piece of prisoner mail and offenders must be afforded certain procedural safeguards." (emphasis added). The Court has further held that the limitation of the First Amendment freedoms must be no greater than necessary or essential to the protection of the "particular governmental interest involved." Prison officials may not censor inmate mail simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Valiant-Bey v. Morris, 829 F.2d 1441; See also Procunier v. Martinez, 416 U.S. 396, 413, 40 L.Ed. 2d 244, 94 S.Ct. 1800 (1974); Wiggins v. Sargent, 753 F.2d 663, 667 (8th Cir. 1985); Thibodeaux v. South Dakota, 553 F.2d 558, 559-60 (8th Cir. 1977).

111. In regard to the applicable institutional policies for censorship, Plaintiffs once again refer to Exhibit I.. Specifically IS13-1.1 Attachment C., Section 5, which governs the institution's guidelines for censorship of "inflammatory" items. Once again Plaintiffs make no challenge to the policy itself. Instead, Plaintiffs contend that the Defendants have unreasonably applied the policy to their publications. The policy specifically states

40

in Section 5. that the items must be "so racially inflammatory as to be reasonably likely to cause violence" and in Section 6., that it must "contain information which can be used to instill violence or hatred among the offender population." The Defendants can not however regulate speech because they disagree with the message conveyed. Thornburn v. Auston, 231 F.3d 1114 (8th Cir. 2000), and the fact is that speech that is vulgar or offensive is indeed protected by the First Amendment. U.S. v. Landham, 251 F.3d 1072 (6th Cir. 2001). The First Amendment right of free speech clearly applies within prison walls. Valdez v. Rosenbaum, 302 F.3d 1039 (9th Cir. 2002).

112. The Supreme Court has held that the First Amendment Freedoms of speech and press encompass the "right to receive information and ideas." Inasmuch as the Plaintiffs have not been allowed by the Defendants to review the specific items censored, once again they have in some cases had third parties review the specific volumes and pages listed in the Censorship Notices, of publications censored for being inflammatory. Third parties have informed the Plaintiffs that the items in question contain only information that has already been widely reported in the commercial news media, and contrary to the Defendants' characterization, is no more inflammatory than the News provided on the prison cable television news programs and/or movies, or the "Black Entertainment Network" Rap Music Video Station (BET), which is on the prison cable system sent directly to each offender's room. Certainly the censored material is no more inflammatory than the information in the long list of magazines available in the Prison Library. Therefore, the items have been wrongfully censored in violation of the constitutional standards. Valiant-Bey v. Morris, 829 F.2d 1441.

113. The test to be considered is that of the material being censored causes a "clear and present danger." Sostre v. Otis, 330 F. Supp. 941.

41

Although the "clear and present danger" test did not originate in prison litigation, it applies as a general principle of law to that specific environment. In fact, due to the tense atmosphere that often exists in such institutions, prison officials are able to exclude materials in some cases, but they have been consistently held by the Courts to the "clear and present danger" standard. The application of the clear and present danger test in a prison setting was explained in Sostre v. Otis Id.:

> "We accept the premise that certain literature may impose such a clear and present danger to the security of a prison, or to the rehabilitation of prisoners, that if should be censored. To take an extreme example, if there were mailed to a prisoner a brochure demonstrating in detail how to saw prison bars with utensils used in the mess hall, or how to provoke a prison riot, it would be properly screened. A magazine detailing incarcerated drug addicts how they might obtain a euphoric "high," comparable to that experienced from heroine, by sniffing aerosol or glue available for other purposes within the prison walls, would likewise be censorable as restraining effective rehabilitation..."

114. It seems however, that in the instant case, the Defendants are motivated solely by their intent to deprive Plaintiffs of everything they can, with or without "legitimate" justification, and with a complete lack of regard for the Constitutional Rights of the Plaintiffs. Inasmuch as the Defendants have been notified and provided the Constitutional and legal standards that they are violating, there is no possible way that any of them could reasonably believe that their actions are constitutional and/or legal. Defendants are so intent on depriving the Plaintiffs of publications with scantily dressed or naked woman, in them that when a publication comes in with an item that Plaintiffs would agree should be reasonably censored, if its not a publication with "sexy pictures of woman in it," Defendants appear to have little if any real concern for genuine safety and security.

115. A classic example of Plaintiffs contentions stated in paragraph 114., is Exhibit H-3, Exhibit H-3, was not censored and allowed directly

Case 6:07-cv-03298-GAF   Document 89   Filed 06/18/10   Page 42 of 50

into the facility, by mail and delivered to Plaintiff Edmonds, without any censorship. The publication is the August 08' issue of Esquire Magazine. Exhibit H-3, contains an article called "The Escape" on page 88. This article provides detailed instructions on "how to escape from prison," and "how to make the tools to get the job done and where to get the materials needed in prison." Clearly, the censorship of this publication would have been related to a legitimate penological interest. Plaintiffs contend that had this article been in an issue of Playboy or Penthouse, it would have undoubtable been censored. Defendants saw no need to censor a men's style magazine like Esquire, because it does not necessarily violate their own personal moral views. Playboys and Penthouses are however, censored for things which require a "stretch of the imagination" to be considered a "legitimate" penological interest. Further, Plaintiffs contend that National Geographic Magazine could possibly really be being censored, not because it contains "posters" or "free gifts," but instead, because its anthropological articles, often include pictures of "naked native woman and/or children." The posters and free gifts could be just a smoke screen, for the true motive.

116. In each and every censorship actually imposed upon the Plaintiffs, for inflammatory content or promoting violence, the information in no way meets the "clear and present danger" standard. Defendants are in fact violating the First Amendment rights of the Plaintiffs.

117. Defendants do not uniformly apply the policies and regulations they assert as grounds for censorship, which in turn has and is leading to improper content-based censorship determinations. Plaintiffs have written to offenders in some of the State's other prisons to see if they were getting the same issues of the publications in question, censored. In many cases

the publications were being censored only at South Central Correctional Center, and not at the other Missouri Institutions.

118. Each Censorship Notice given to the Plaintiffs refers to a specific publication, date, and/or volume number, and states the specific reason for censorship and the specific page numbers that the offending item(s) are on. However, when Plaintiffs inquired with Offenders at other Missouri institutions, to see if the same publications were being censored at their facilities, in many cases, not only were they not being censored, but the Offenders at the other institutions made copies of the specific offending pages cited in the Censorship Notices, and sent them to the Plaintiffs. When the alleged "offending pages" came to the Plaintiffs as photocopies, and not part of a publication, the same pages for which and entire publication was seized and previously determined by the Defendants to be so dangerous to safety and security of the prison facility, as to call for the compromising of Plaintiffs' Constitutional Rights, the photo copies of the offending pages were allowed right in through regular mail without being censored. (See Exhibit H-23 & H-24). Plaintiffs contends that if anything, "personal First Class Mail," coming from a inmate in another prison facility, should be scrutinized much more diligently then a publication coming directly from a publisher. Yet, Defendants found no need to censor the same pages that resulted in the censorship of entire publications, when the pages were photo copied and sent by First Class mail from an inmate at another institution. (See Prison Legal News v. Lehaman, 272 F. Supp. 2d. at 1156.)

119. Clearly this results in a threshold demonstration that it is not in reality the alleged offending pages cited as the reason for censorship, but instead, the Defendants' personal opinion of the publication itself,

44

and in may cases, the censorship clearly appears to be motivated simply by callous disregard for the Plaintiffs' Constitutional Rights.

120. The Defendants' actions have additionally resulted in violations of the Plaintiffs' Rights under the 14th Amendment in that they have treated the Plaintiffs differently than prisoners similarly situated. Plaintiffs are or were at the time of the censorships in question, each classified as Level Class 5, Maximum Security Inmates, and were or are, each housed at S.C.C.C., in Licking, Texas County, Missouri, a Level 5 Maximum Security Prison. However, Plaintiffs' Exhibits H-17 through H-24, provide evidence that the same class of inmates, of the same security level, in a Missouri Facility of the same security level, (Jefferson City Correctional Center), were not subjected to the same censorships, of the same specific publications which Plaintiffs were subjected to. See Id. Murphy, 372 F.3d at 984.

121. The same type of reckless and callous disregard for the First Amendment rights, of the Plaintiffs, as well as their due process safeguards, which are constitutionally protected, are further demonstrated in the Administrative Remedy Process. In many cases, Plaintiffs received Censorship Notices citing the page numbers of the alleged offending item(s). Then, when the Plaintiffs addressed the censorship via the Administrative Remedy Process, the Defendants' Responses address issues not even cited in the Censorship Notices and fail to address the issue cited in the Censorship Notice. (See Exhibits E. pp.243-250, 258-263, 278-285, 286-293, 323-328; Exhibits F, pp.351-365, 374-383, 384-391, 392-400, 401-409, 421-431, 443-470, 591-599; Exhibits G. pp.622-633, 634-641.) As a result, even if the Plaintiffs were allowed to review the alleged "offending materials," (which they are not), Plaintiffs could never effectively perfect any appeal of the censorship, because Defendants simply Respond with grounds for censorship

Case 6:07-cv-03298-GAF   Document 89   Filed 06/18/10   Page 45 of 50

previously "undisclosed" to Plaintiffs. These actions of the Defendants virtually nullify the Administrative Remedy Process and make it impossible for Plaintiffs to address the specific reasons the publications were censored.

122. Plaintiffs have also discovered that the "original decisionmaker" is the only party at South Central Correctional Center that sees the offending material. The parties that have responded to the Administrative Remedy Requests, have never seen the publications. In fact, Plaintiffs have good reasons to believe that Defendant John Rogers, who while acting as the Censorship Committee Member, signed off on the censorship, has never once reviewed any of the publications he signed off on. Further, Plaintiffs know for sure that the respondents to the Administrative Remedy Process at the stages within South Central Correctional Center, have never seen the alleged offending censored material. Plaintiffs know this, because they have asked the parties personally. See Krug v. Lutz, 329 F.3d 692, 697-98 (9th Cir. 2003).

123. At no time have the Defendants provided the publishers of the publications any Notice that issues of their publications are being censored. The Courts have continuously upheld that, "both sender and the intended recipient must receive notice of the censorship and an opportunity to appeal the same." Montcalm Publishing Corp. v. Beck, 80 F.3d 105, 109-10 (4th Cir. 1996); See also Krug v. Lutz, 329 F.3d 692. 697-98 (9th Cir. 2003).

124. In addition to the contentions in Paragraphs 120. through 123., Plaintiffs contend that the Censorship Notices provided by the Defendants do not provide any specific information about what was contained on the offending pagers of a publication, in regard to sexual content. The notices only state that the content violates "sections A. through H. of Attachment

Case 6:07-cv-03298-GAF   Document 89   Filed 06/18/10   Page 46 of 50

C. of the censorship policy." The specifics are never listed. Likely because the material never actually contains any of the material itemized in sections A. through H. of the censorship policy. (See Exhibit I.)

## Conclusion

125. Plaintiffs understand and recognize that prison regulations that restrict inmate access to publications are valid if the regulations are reasonably related to "legitimate penological interests." Thornburgh v. Abbott, 490 U.S. 401, 404, 412-14 (1989). Further, the constitutional rights of offenders and the rights of those who send them mail, are subject to substantial limitations and restrictions in order to allow prison officials to achieve such "legitimate" penological goals and maintain institutional security. Walker v. Sumner, 917 F.2d 382, 385 (9th Cir. 1990). However, the Court must consider (1) whether there is a rational connection between the regulation and a neutral, legitimate government interest; (2) whether alternative means exist for the inmates to exercise the constitutional right; (3) what impact accommodating the right would have on prison inmates, personal, and resources; and (4) whether obvious and easy alternatives exhist. Turner v. Safley, 482 U.S. 78 (1987).

126. In regard to the publications which were censored for containing stickers, posters, or other free items, Plaintiffs are not convinced that any policy that provides for "censorship of the content of publication," for those reasons, even exists. "Censorship of publications," is governed by Policy IS13-1.1 Attachment C. "Guidelines for Censoring Items," (See Exhibit I.) which provides no authorization for the "censoring" of a publication because it contains stickers, posters, paper 3-D glasses, or any other free gift. There does appear to be policies which prohibit some items of this nature, but the policy speaks nothing of censoring the content

Case 6:07-cv-03298-GAF   Document 89   Filed 06/18/10   Page 47 of 50

of a publication as the result of those items being in and/or mailed with the publication. If there is some hidden version of policy that allows "censorship" of a publication because it contains the foregoing items we challenge the "legitimacy" of a government interest in that policy. If there is no such policy, we challenge the application of the policy that prohibits the forgoing items as a means to censor the content and information contained within a publication. We have offered a reasonable alternative that will require far less man hours and prove to be far less burdensome upon the Defendants, then the filing of censorship forms and archiving of censored material while the Administrative Remedy process is being completed. "Simply removing and discarding of the prohibited item," and forwarding the publication itself to the Plaintiffs." Defendants can provide no reasonable explanation as to why the alternative would be more burdensome or demonstrate any reasonable rounded fear that it would lead to greater harm.

127. Further, Plaintiffs contend that the policy that provides for the censorship of items because they were mailed with posters, stickers other free items that are not a part of the cover price, or are otherwise prohibited, (if it does exist), is not uniformly applied, and appears to be being used to facilitate the imposition of the personal moral and/or religious beliefs and opinions of the censoring parties. This leads to censorship determinations which improperly censor "content." Therefore, the publications must be specifically reviewed for satisfaction of the factors stated in Turner Id..

123. Plaintiffs do not bring a challenge to the policy the prohibits sexually explicit materials, or inflammatory material. However, once again Defendants have not reasonably applied these policies to the publications in question. Further, Defendants should be held to demonstrate that the

48

publications censored meet a "legitimate" penological interest when viewed
in the context of publications they did not censor, during the same time
period. They should be held to demonstrate "penological legitimacy," was
applied, not "arbitrary personal moral and/or religious perspectives." See
Murphy, 327 F.3d at 986 (deciding a regulation valid and neutral in other
respects "may be invalid if it is applied to a particular item in such a
way that negates the legitimate concerns").

129. Plaintiffs constitutional safeguards pursuant to the 14th Amendment
have been violated, in that there is no way to properly perfect appeals
of censorships in that Defendant will not allow Plaintiffs to ever review
the censored material. Thornburgh v. Abbott, 490 U.S. 401; 109 S.Ct. 1874;
104 L.Ed. 2d 459.

130. In addition, Defendants are/have violated the Plaintiffs' rights
under the 14th Amendment, which requires that the government treat similarly
situated people, alike. A protection that applies to prison inmates. Inmates
at other Missour facilities of the same security level, were not subjected
to the censorship of the same publications. Further when the offending
material was mailed directly from one facility to the Plaintiffs' facility,
in regular U.S. Mail, and not attached to a publication, it was not censored
and given directly to the Plaintiffs.

131. That any award of damages, or compensation for fees and/or costs
etc., should not be subject to any action by the State of Missouri to recoup
expenses for costs of Plaintiffs' incarceration Pursuant to the "Missouri
Incarceration Reimbursement Act," Sections 217.825 to 217.841 RSMo, inasmuch
as such subject would interfere with the purpose of Section 1983, which
is to allow compensation for civil rights violations by the state. Hankin
v. Finnel, C.A.8 (Mo.) 1992, 964 F.2d 853, rehearing denied, certiorari

113 S.Ct. 635, 506 U.S. 1013 121 L.Ed. 2d 566.

WHEREFORE, for the reason stated herein, Plaintiffs pray the Court will find in their favor, and for any or other as the Court deems just and proper.

Plaintiffs Pro Se.

### CERTIFICATE OF SERVICE

Plaintiffs hereby certify and inform the Court that on this _10TH_ day of _June_, 2010, a true and correct copy of the foregoing Memorandum and related Complaint, were mailed via First Class U.S. Mail, postage prepaid, and addressed as follows:

Cheryl Ann Schuetze
Assistant Attorney General
P.O. Box 899
Jefferson City, MO 65101

We, further swear under penalties of perjury, that all information in the foregoing is true and correct to the best of our knowledge and belief.

Respectfully submitted,

_Michael Dean_
MICHAEL A. DEAN

_Jean Paul Gibson_
JEAN PAUL GIBSON

_Pat Edmonds_
PAT EDMONDS

_6/10/10_
DATED